# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00496-CV
NO. 03-09-00497-CV

**Christina Prince, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

FROM COUNTY COURTS AT LAW NOS. 2, 4 OF WILLIAMSON COUNTY,
NOS. 07-2732-FC2, 08-282-FC4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Christina Prince appeals from the trial court's decrees terminating her rights to three of her children: T.A.U., H.D.P., and H.A.P. At the time of termination, T.A.U., H.D.P, and H.A.P. were nine, four, and one, respectively. The Texas Department of Family and Protective Services (the "Department") originally initiated a case regarding T.A.U. and H.D.P.; however, shortly after the Department opened the case, H.A.P. was born, and the Department started an additional case for him. From the time that the Department became involved in the case, Christina[1] was married to Ronnie Prince. Ronnie is the father of H.D.P. and H.A.P. but not T.A.U. After numerous hearings occurring over more than a year, the trial court terminated Christina's rights to her children.

---

[1] Because several of the people involved in this case have identical last names, we will refer to those individuals by their first names.

The Department first became involved in this case in 2007 when the Department received a report regarding potential burn marks on T.A.U. After receiving the report, the Department sent Jennifer Williamson to investigate the claim and to interview T.A.U.

During her investigation, Williamson discovered that prior to Ronnie and Christina moving to Texas, Ronnie had a criminal history of family violence, including injury to T.A.U. and Christina. Specifically, Williamson found out that a court in another state had previously ordered Ronnie to have no contact with T.A.U. and H.D.P. because of an injury T.A.U. had sustained from Ronnie, that the no-contact order was violated, and that the children were removed from Christina's care because of the violation. Further, Williamson discovered that Ronnie previously went to prison for domestic violence. In addition, Williamson learned that Ronnie had a history of drug abuse.

During her interviews with T.A.U., Christina, and Ronnie, Williamson obtained further details regarding Ronnie's violent past, his drug use, and other issues. For example, T.A.U. related an incident where Ronnie attempted to assault Christina in a car but hit T.A.U. instead, which resulted in T.A.U. getting a black eye. Further, T.A.U. told Williamson that Ronnie would hit her and H.D.P. in the face and that Ronnie spanked them hard enough to cause bruising.[2] T.A.U. also stated that she was going to get into trouble for talking to Williamson because she is not supposed to discuss things that happen at home. During an interview, Christina admitted that she and Ronnie were physically aggressive with one another, that she had been arrested for assaulting Ronnie in front of the children, and that during one of their fights, T.A.U. was hit in the eye. Christina also stated

_____

[2] In her testimony, Williamson explained that she did not see any physical indication that H.D.P. had been abused.

that she allowed Ronnie to discipline T.A.U. even though Ronnie had a history of family violence.

In addition to conducting her own interviews, Williamson also reviewed statements T.A.U. made to an interviewer at the Children's Advocacy Center. Specifically, T.A.U. stated that she had seen Ronnie hit Christina, that Ronnie drinks and smokes "black brown" things that cause him to act "weird," and that Ronnie and Christina leave her alone in the house sometimes.

After Williamson's investigation, the Department removed the three children from the Princes' home. At that time, the Department recommended family reunification for all three children, and the trial court informed Christina that if she complied with the requirements of her service plan, her children would likely be returned to her. During a preliminary hearing, the trial court ordered that the three children be returned to Christina but explicitly conditioned their return on Ronnie vacating the residence and not having access to the children and on Christina attending individual therapy sessions, participating in basic parenting classes, submitting to drug tests, finding a suitable home, and finding a job.[3] Those conditions were incorporated into various orders and were repeated by the court several times, and Christina expressly promised to keep Ronnie away from the children. During subsequent hearings, the trial court repeatedly informed Christina that she had to fully comply with the requirements imposed by the court, including attending therapy and prohibiting Ronnie from having access to the children. Further, the court warned Christina that the cases would proceed to termination if she did not completely comply with the requirements given to her.

---

[3] Ronnie initially agreed to these conditions as well, but he stopped participating in the case shortly after one of his drug tests came back positive.

After returning the children to Christina, the Department later removed the children from Christina's custody again when Karen Kaufman (a therapist) informed the Department that T.A.U. had made statements indicating that she might have been sexually abused. When the Department went to remove the children, Ronnie was in the home. During a subsequent hearing, Christina admitted that Ronnie had been found in the house, but she denied that he lived there. Christina also communicated that she allowed Ronnie to have access to their home when the children were not around. In later hearings, Christina assured the court that she had officially separated from Ronnie and had stopped seeing him. In fact, Christina stated that she had moved out of their house in order to get away from him, that she no longer wanted Ronnie to have contact with the children, that Ronnie was dangerous, and that she would comply with an order prohibiting her from allowing Ronnie to have contact with the children.

In a hearing occurring before the final termination proceeding, Christina again urged that she was not living with Ronnie or anyone else; however, Christine Ashworth, a Department representative, testified that she believed that a man was living with Christina in her new home. Specifically, Ashworth stated that she found men's clothing inside Christina's home and on a clothes line outside. During the hearing, Ashworth also stated that Christina's home was not safe for children. Specifically, she testified that there were holes in the side of the home, that the boards were rotted, that the door to the home had to be propped up by a shovel, and that feces or rotten meat was on the ground close to the home.

Later, the landlord for Christina's new home, Klevon Smith, confirmed that Christina was living with Ronnie right before the termination hearing. After identifying Ronnie from a

photograph, Smith testified that Christina and Ronnie jointly rented a home from him, that Ronnie lived in the home full-time, and that they lived in the home for several months until Smith evicted them. Further, Smith explained that Ronnie drank heavily and that the police had been called to the Princes' home on several occasions.

In addition to testimony showing that Christina allowed Ronnie to be in the Princes' home, other evidence was introduced showing that Christina had failed to fully comply with the other requirements imposed by the trial court. For example, a Department employee testified that Christina had missed a drug-testing appointment and had missed several of her individual therapy appointments.

After several hearings were conducted, the Department switched the focus of the case from reunification to termination, and a termination hearing was scheduled. The hearing lasted two days, and Christina did not attend either day. Further, Christina's attorney informed the court that Christina "knew about [the] hearing."

During the termination hearing, various witnesses testified, including therapists for T.A.U., H.D.P., and Christina. First, Kaufman, who was one of T.A.U.'s therapists, described her therapy sessions with T.A.U. Specifically, Kaufman related that during her sessions, T.A.U. indicated that she had been physically and sexually abused. According to Kaufman, T.A.U. also stated that Ronnie had beaten her, had touched her inappropriately, and had threatened to hurt Christina if T.A.U. ever discussed the abuse with anyone. In addition, Kaufman testified that therapeutic drawings that T.A.U. had made and certain physical behaviors that she engaged in were consistent with sexual abuse, but she also admitted that her assessment of the drawings was highly

5

subjective and that T.A.U. is prone to fantasy. Ultimately, Kaufman opined that T.A.U. should not be placed into the custody of Ronnie or Christina.

Second, Ronnie Williams, another of T.A.U.'s therapists, testified regarding her sessions with T.A.U. In particular, Williams stated that she believed that T.A.U. was depressed, that T.A.U. had experienced "a lot of trauma," that T.A.U. had been physically and emotionally abused, and that T.A.U. had experienced "a lot of vicarious abuse I think between Ronnie and [Christina]"; however, Williams admitted that she could not recall any specific abuse allegations by T.A.U. Further, Williams testified that T.A.U. strongly disliked Ronnie. Like Kaufman, Williams admitted that T.A.U. tended to exaggerate and could be making up some of her claims. Williams also related that she did not see any evidence of a strong bond between T.A.U. and Christina, and Williams recommended that T.A.U. not be returned to Christina's custody.

Third, H.D.P.'s therapist, Michelle Tarbell, testified regarding her therapy sessions with H.D.P. Specifically, Tarbell related that H.D.P. did not have a connection with Christina, never freely mentioned her, never stated that he loved his mother, and could not readily recall regularly interacting with his mother.[4] Moreover, Tarbell expressed that H.D.P. had behavioral issues that might require the primary care giver to have specialized training. Further, she stated that placing H.D.P. in an environment with domestic abuse would be detrimental to H.D.P. and that she opposed placing H.D.P. into a home where Ronnie was present.

Finally, Deborah Taber, who was Christina's therapist, testified. Taber related that Christina would fluctuate between being very diligent in attending therapy and then missing therapy sessions for weeks at a time. Further, Taber stated that she eventually had to discontinue her therapy

---

[4] By the time Tarbell testified, H.D.P. had not seen his mother for approximately one year.

6

sessions with Christina a few months before the termination hearing. Regarding Christina's ability to be an effective parent, Taber testified that after having 28 therapy sessions with Christina, she could not recommend placing the children back into Christina's custody. Specifically, she explained that Christina's home was not a safe environment for children, that she was not working steadily, that she was still involved with Ronnie, that she sometimes worked for a man belonging to a gang, that she could not be a protective parent, and that she was very depressed. Moreover, although her recommendation was based on information obtained from other people, Taber warned that if the children were placed into the custody of Christina, "they would be subject to violence, they would be subject to drug use, instability, malnutrition. Any possible type of neglect and abuse, possibly sexual abuse, would be [her] concern."

In addition, Taber related the type of relationship that Christina said that she had with Ronnie. According to Taber, Christina explained that she and Ronnie were violent with one another, that Ronnie threw parties where drugs were consumed, and that Christina was unable to stop Ronnie from engaging in inappropriate activities, including allowing a relative to move into their home even though the relative was an alcoholic that may have been "prostituting herself to obtain alcohol." Further, Taber related that at the time Christina moved to Texas, Ronnie was in prison for assaulting Christina and that after his release, Ronnie immediately moved into her home. In addition, Taber expressed her belief that Christina was still involved with Ronnie and that Ronnie's presence would not be beneficial for the children. In fact, Taber testified that Christina had stated on more that one occasion that she cannot function without Ronnie in her life.

At the conclusion of the termination hearing, the trial court determined that the evidence weighed in favor of termination and signed an order terminating Christina's parental rights

7

and the parents rights of the children's fathers. Specifically, the court found "by clear and convincing evidence" that Christina constructively abandoned the children, demonstrated an inability to provide the children with a safe environment, and "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the" children. *See* Tex. Fam. Code Ann. § 161.001(1)(N), (O) (West Supp. 2009). Regarding T.A.U. and H.D.P., the court also found by "clear and convincing evidence" that Christina knowingly placed or allowed the "children to remain in conditions or surroundings which endanger[ed]" their well-being and that Christina "engaged in conduct or knowingly placed the children with persons who engaged in conduct which undermine[d]" the children's well-being. *See id.* § 161.001(1)(D), (E) (West Supp. 2009). The court further found that it was in the children's best interests to terminate Christina's parental rights.

Christina filed a notice of appeal and a statement of points on appeal, complaining that there is insufficient evidence to support the termination and appointment of the Department as permanent managing conservator and that the 15-day appellate deadline listed in the family code is unconstitutional and violates the separation of powers. *See id.* § 263.405 (West 2008) (requiring filing of statement of points within 15 days after final order is signed). The statement of points also sought to raise any issue that may be discovered upon reviewing the record. However, on appeal, Christina's appellate attorney has filed a brief stating that, after a thorough review of the record, he has concluded that the appeal is frivolous.[5] The brief presents a thorough and professional

___

[5] Christina's attorney notes that although a copy of Kaufman's therapy notes were admitted as an exhibit, those notes are not in the reporter's record. Christina's attorney asserts that even though those notes are missing, the case should not be reversed for a new trial. *See* Tex. R. App. P. 34.6(f) (explaining circumstances in which appellant should be given new trial when part of

evaluation of the record discussing and demonstrating why there are no arguable grounds for reversal.[6] A copy of the brief was delivered to Christina, and Christina has not filed a pro se brief. The Department filed a letter response stating that it agreed that there are no arguable grounds for reversal.

We have conducted our own review of the record and agree that the appeal is frivolous. Accordingly, we affirm the trial court's decrees of termination. In addition, we grant Christina's counsel's motion to withdraw as attorney of record.

_____

David Puryear,  Justice

Before Justices Patterson, Puryear, and Henson

Affirmed

Filed:   August 20, 2010

_____

record has been lost or destroyed). Specifically, her attorney points out that Kaufman testified as to the contents of her notes and that her testimony is in the record. Alternatively, her attorney states that the case can be affirmed on the ground that Christina repeatedly violated court orders. We agree that the missing notes do not warrant a reversal in this case.

[6] This and other Texas courts have held that it is appropriate in a parental termination case to file a brief asserting that the appeal is frivolous. *See, e.g.*, *Matthews v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-04-00184-CV, 2005 Tex. App. LEXIS 1231, at *2 (Tex. App.—Austin Feb. 17, 2005, no pet.) (mem. op.); *In re D.E.S.*, 135 S.W.3d 326, 329 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *In re K.D.*, 127 S.W.3d 66, 67 (Tex. App.—Houston [1st Dist.] 2003, no pet.).